## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JOSEPH GOSLINE,**

          Plaintiff,

    vs.                       No. 1:07-cv-1274 MCA/RLP

**NEW MEXICO FINANCE
AUTHORITY, et. al,**

          Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on *Defendants William C. Sisneros' and John T. Duff's Motion for Summary Judgment* [Doc. 41], filed July 1, 2008.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court concludes that the Motion should be **GRANTED.**

## I.    BACKGROUND

Plaintiff Joseph Gosline brings this lawsuit alleging various federal and state law claims arising from the termination of his employment as the Chief Financial Officer of the New Mexico Finance Authority ("NMFA").  The movants are William C. Sisneros, who was the Chief Executive Officer of the NMFA at the time of Gosline's discharge, and John T. Duff, who was the Chief Operating Officer at the time.

The NMFA is an instrumentality of the State of New Mexico created by the Legislature "to coordinate the planning and financing of state and local public projects, to provide for long-term planning and assessment of state and local capital needs and to

improve cooperation among the executive and legislative branches of state government and local governments in financing public projects." NMSA 1978, § 6-21-2B (1992). The NMFA first hired Gosline as a Senior Accountant in April 2000. [Doc. 21 at 3.] He held various positions until October 2004 when he left NMFA's employ for approximately one year. [Id.] Gosline returned to the NMFA in October 2005 and was hired as the Chief Financial Officer, which position he occupied until he was terminated in December 2007. [Id.]

The events leading to Gosline's termination began in April 2007 when Information Technology Director Guillermo Yanez discovered that a computer virus had been introduced into NMFA's email system through a spam email. [Doc. 36 at 2 (Yanez Aff. ¶ 3).] The NMFA expended a week's worth of time and in excess of $10,000 to eradicate the virus from the system. [Id.] This prompted Yanez to draft new acceptable use policies related to electronic communications and email. [Id. (Yanez Aff. ¶ 4).] The new policy permitted some personal use of NMFA computers so long as the personal use did not interfere with company business and otherwise complied with the policy. [Doc. 36-2 at 2 (Yanez Aff. Ex. A-1).] The new acceptable use policy expressly prohibited accessing pornographic, "offensive," or sexually explicit messages or graphics. [Id. at 1 (Yanez Aff. Ex. A-1).] Whether these policies were implemented in final form prior to Gosline's termination is disputed. However, Gosline was on the IT Committee, was aware of the new policies, and participated in formulating them. [Doc. 36 at 2 (Yanez Aff. ¶ 5).] He received a draft of the new policies via email on May 29, 2007. [Id. (Yanez Aff. ¶ 6).] Yanez also circulated the

2

draft policies to NMFA's department heads and posted the policies on the NMFA's website. [Id. (Yanez Aff. ¶ 4).]

In July 2007, Yanez received notice of a suspicious movement of computer files in the NMFA's Accounting Department.[1]  [Doc. 36 at 3 (Yanez Aff. ¶ 8).]  He initiated an investigation into the unauthorized movement of the files by hiring outside consultants to investigate and by installing monitoring software on the computers in the Accounting Department.  [Id.]

The investigation revealed that Gosline's computer was infected with a computer virus, which had so severely damaged the hard drive that it had to be replaced.  [Doc. 36 at 3 (Yanez Aff. ¶ 9).]  The virus had been introduced to Gosline's computer by Accounting Department employee Grace Romero.  [Id.]  Romero allegedly picked up the virus on her own NMFA computer by visiting an infected website, and then transferred the virus to Gosline's computer when she logged on to it using her name and password.  [Doc. 36-4 at 4.]

The discovery of a virus on Gosline's computer led Yanez to suspect that NMFA computers were being used for unauthorized purposes and in contravention of the newly drafted acceptable use policies.  [Doc. 36 at 3.]  He stepped up his investigation, installing additional monitoring software, and hiring more consultants to investigate.  [Id.]

Here, the facts become disputed.  Sisneros and Duff assert that the monitoring software revealed that Gosline was using his NMFA computer to send and receive sexually

---

[1]Gosline, as Chief Financial Officer, supervised the Accounting Department.  [Doc. 56 at 8.]

explicit material, including nude photographs of himself, to solicit sexual liaisons on the Santa Fe Craig's List site, and to access his personal email account with excessive frequency during working hours. [Doc. 36 at 3 (Yanez Aff. ¶ 10); Doc. 39 at 5–; Doc. 40 at 3.] Gosline admits that he inadvertently opened email with inappropriate sexual content, but claims he did not know what the emails contained. He otherwise denies the allegations. [Doc. 46-2 at 2 (Gosline Aff. ¶ 4).]

It is undisputed, however, that NMFA hired Defendant Robert Caswell Investigations ("RCI") to further investigate the alleged misuse of computers as well as the suspicious file movements. [Doc. 46-2 at 2.] RCI interviewed Gosline in early November 2007 and administered a polygraph examination. [Id. at 2–3.] The polygraph examination was directed toward uncovering financial improprieties, and it was reported that Gosline "passed." [Doc. 36-4 at 6.] Nevertheless, Gosline was immediately placed on administrative leave pending investigation into allegations that he had misused his computer. [Doc. 39-3.]

On November 26, 2007, Defendant Duff sent Gosline a memorandum notifying him that he would recommend to Defendant Sisneros that his employment be terminated because the NMFA learned that he had used his workplace computer and network "to visit dating services with a primary purpose of soliciting sexual relationships and had sent sexually explicit email to those sites from work." [Doc. 39-4 at 1.] According to Duff, Gosline's use of the computer violated NMFA's Acceptable Use policy and was "particularly improper because of [his] status as a role model for the employees who [he] supervise[d]." [Id.] Duff further stated that Gosline's actions reflected "very poor judgment on the part of a manager"

4

such that "progressive discipline was not appropriate."  [Id.]

On December 6, 2007, Gosline attended a pre-termination meeting at which he was represented by counsel.  [Doc. 39 at 6; Doc. 40 at 5.]  Defendant Sisneros terminated Gosline's employment on December 11, 2007.  [Doc. 40 at 5.]  The reasons given for the termination were that Gosline "violated the New Mexico Finance Authority's Acceptable Use policy" by using his NFMA computer and its network to solicit sexual relationships and to send sexually explicit email.  [Doc. 37-5 at 1 (Termination Letter).]  Sisneros stated in his letter that Gosline had used the "NMFA network, equipment and time for the purpose of viewing sexualized material sent to a private email account" and that he had sent a "sexually explicit picture of [himself] from [his] work computer in response to messages that [he] opened at work."  [Id. at 3.]  The Termination Letter stated that Sisneros considered Gosline's conduct particularly improper because of his status as a role model and supervisor of other employees.  [Id. at 1.]  The polygraph exam, according to the Termination Letter, played no part in the termination decision.  [Id. at 2.]

Gosline disputes the reasons given for his termination and alleges that the real reason he was terminated was his participation in an investigative interview conducted by the Environmental Protection Agency ("EPA") into an anonymous complaint regarding the alleged misappropriation of funds by a senior person working at NMFA.  [Doc. 21 at 11–12.]  It is undisputed that on October 31, 2007—several days before he was interviewed by RCI and placed on administrative leave—Gosline was interviewed by agents from the EPA.  [Doc. 38 at 2.]

5

Gosline filed this lawsuit on December 18, 2007.  [Doc. 1.]  He filed an Amended Complaint on March 8, 2008, in which he asserted fifteen causes of action.  [Doc. 21.] Several counts against NMFA and Defendants Duff and Sisneros were subsequently dismissed by stipulation.  [Doc. 34.]  Duff and Sisneros now move for summary judgment on all the remaining counts.  They also assert the defense of qualified immunity.

## II.   LEGAL STANDARDS

### A.   Summary Judgment

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The party opposing summary judgment "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial."  Fed.R.Civ.P. 56(e)(2).  Judgment is appropriate "as a matter of law" if the nonmoving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Lopez v. LeMaster, 172 F.3d 756, 759 (10th Cir. 1999).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  Celotex, 477 U.S. at 324.  It is not the court's role, however, to weigh the evidence, assess the credibility of witnesses,

or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551–52 (1999).

## B.   Qualified Immunity

When an individual defendant raises the affirmative defense of qualified immunity in a summary judgment motion, as Defendants Sisneros and Duff have, the burden shifts to the plaintiff to establish that the defendants' actions violated a constitutional or statutory right and that the right at issue was clearly established at the time of the defendants' unlawful conduct.  Gross v. Pirtle, 245 F.3d 1151, 1155–56 (10th Cir. 2001).  "Determining whether a defendant is entitled to qualified immunity involves answering two questions: (1) whether a plaintiff has asserted that the defendant violated a constitutional or statutory right, and if she has, (2) whether that right was clearly established such that a reasonable person in the defendant's position would have known that his conduct violated that right."  Keylon v. City of Albuquerque, 535 F.3d 1210, 1218 (10th Cir.2008) (internal citations and quotations omitted).[2]  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks

---

[2]Until recently, courts could not proceed to the second step of the qualified immunity analysis until the first step had been resolved.  See Saucier v. Katz, 533 U.S. 194 (2001).  The order of these steps, however, is no longer mandatory.  Pearson v. Callahan, ___ U.S.___, 129 S.Ct. 808 (2009), overruling Saucier v. Katz, 533 U.S. 194 (2001).

whether 'the right [was] sufficiently clear that a reasonable officer would understand that what he is doing violates that right." <u>Gross</u>, 245 F.3d at 1156 (quoting <u>Wilson v. Layne</u>, 526 U.S. 603, 615 (1999)) (brackets and quotation marks in original).

If the plaintiff fails to meet this burden, then the Court must grant the defendant qualified immunity.  <u>Gross</u>, 245 F.3d at 1156.  If the plaintiff does establish the violation of a clearly-established right, for purposes of the defendant's summary judgment, the burden shifts to the defendant to prove that there are no genuine issues of material fact and that he or she is entitled to summary judgment as a matter of law.  <u>Gross</u>, 245 F.3d at 1156.

## III.   ANALYSIS

### A.   Federal claims

Gosline's federal claims are actionable under 42 U.S.C. § 1983, which provides, in relevant part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.

Persons sued in their individual capacity under this civil rights statute generally are entitled to qualified immunity unless it is shown that their actions violated a specific federal statutory or constitutional right and that the right that they allegedly violated was clearly established at the time of the conduct at issue.  <u>Oliver v. Woods</u>, 209 F.3d 1179, 1185 (10th

Cir. 2000).  "Ordinarily, for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Poindexter v. Bd. of County Comm'rs of County of Sequoyah, 548 F.3d 916, 930 (10th Cir. 2008) (citation and quotation marks omitted).

Because Defendants have asserted the defense of qualified immunity, the burden lies with Gosline.  With these standards in mind, the Court turns to review the Constitutional violations Gosline alleges.

### 1.   Fourteenth Amendment: Property Interest and Procedural Due Process (Counts I and II)

Gosline alleges that Sisneros and Duff deprived him of procedural due process (Count I) and a property interest (Count II) in violation of the Fourteenth Amendment.  Gosline's procedural due process claim essentially is that the pre-termination hearing he received was inadequate.  Because the amount of process due Gosline prior to termination depends on whether he was deprived of a protected property interest, the Court first addresses Count II. See Hyde Park Co. v. Santa Fe City Council, 226 F.3d 1207, 1210 (10th Cir. 2000) (absence of protected property interest forecloses procedural and substantive due process claims).

A protected property interest, for Fourteenth Amendment purposes, means "a legitimate claim of entitlement" to some benefit.  Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972).  It must be more than an abstract need or a unilateral expectation. Roth, 408 U.S. at 577.  The Constitution does not create property interests; rather, they must

"stem from an independent source such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Roth, 408 U.S. at 577.

"Under New Mexico law, a public employee has a protected property interest only if he has an express or implied right to continued employment." Rusillo v. Scarborough, 935 F.2d 1167, 1170 (10th Cir. 1991). An employee's at-will status ordinarily forecloses a property interest claim because the employee has no legitimate expectation of further employment. Rusillo, 935 F.2d at 1170 (citing Bishop v. Wood, 426 U.S. 341, 345–47 (1976)).

Sisneros and Duff argue that Gosline was an at-will employee and thus could have been terminated for any reason without implicating Constitutional due process rights. Employment in New Mexico is presumptively at will unless there is an express contractual provision stating otherwise. Hartbarger v. Frank Paxton Co., 857 P.2d 776, 779 (N.M. 1993). In certain circumstances, an implied contract to terminate only for cause can arise. Hartbarger, 857 P.2d at 779–80. Here, the only evidence presented indicates that Gosline was an at-will employee. Gosline was most recently hired by NMFA in October 2005. It is undisputed that in effect at that time were written Personnel Policies established in May 2005. Section 1.2 of the May 2005 Personnel Policies is titled "At-Will Employment" and states:

> Employment with NMFA is "at-will" employment. This means that the employee may terminate his or her employment at any time. During an employee's orientation period [NMFA] can terminate the employee's employment at any time, with or

without notice or cause.  If the employee has completed the orientation period and is considered a full-time employee [NMFA] will follow Discipline Procedures under section 8.11.  Nothing in this policy confers on an employee any property rights to their position either in the orientation period or when they become a regular full or part-time employee.  While [NMFA] generally adheres to progressive discipline, it is not bound or obligated to do so.  Again, in the sole discretion of [NMFA], the employee may be terminated at any time, with or without notice or cause.  As an at will employee, the employee is not guaranteed, in any manner that he or she will be employed for any set period of time.  No representative of [NMFA] other than the Executive Director has the authority to enter into any agreement, implied or explicit, with prospective employees for employment for any specified period.

[Doc. 37-2 at 2–3.] Section 1.2 clearly and explicitly states that employment is "at-will" and that employees do not have property rights in continued employment.  Gosline thus had no right to expect continued employment or to expect that he would only be terminated for cause.  See Lukoski v. Sandia Indian Mgmt. Co., 748 P.2d 507, 509–10 (N.M. 1988) (employment manual that clearly and conspicuously states that employment is terminable at the will of the employer instills no reasonable expectation of job security).

Gosline argues that Section 1.2 represents a change from NMFA's prior policy, that it was adopted unilaterally without notice or hearing, and it is therefore unenforceable as to him.  The prior policy Gosline refers to apparently is NMFA's 1998 Personnel Manual which states that "[r]egular, non-probationary employees may be dismissed for good cause[.] [Doc. 46-12 at 2.]  According to Gosline, NMFA was required to "send out notice indicating a hearing before adopting any revision" and its alleged failure to do so deprived him of his constitutional interest in continued employment.

This argument is without merit.  Gosline was not an employee of NMFA in May 2005 when the at-will provisions took effect.  Even if an employer must provide current employees

with notice and hearing before changing from a "for cause" to an "at-will" employer, Gosline fails to explain how persons who are not employees (or who are former or future employees) have any constitutional interest at stake when an employer changes its policies. The Court thus does not agree that NMFA was required to provide Gosline with notice and a hearing before adopting any changes to its employment policies during a time when Gosline was not an employee.

The Court also is not persuaded that the progressive discipline policy creates an ambiguity or gives rise to an implied contract to terminate only for cause. The progressive discipline policy, contained at Section 8.11 of the 2005 Personnel Policies, states in part:

> 8.11   DISCIPLINE PROCEDURES
> For all regular full and part-time employees, [NMFA] will generally use a system of progressive discipline, except that the nature and severity of the discipline will be determined on an individual basis according to the particular circumstances. Depending upon the seriousness of the issue being addressed, any and all of the steps outlined below may be bypassed during the disciplinary process.
> ...
> Upon the recommendation of the department manager and the approval of the Executive Director, an employee may be discharged when, in the opinion of the department manager and the Executive Director, the nature of a violation warrants it or if previous disciplinary actions have not resolved the problem.

[Doc. 46-11 at 1, 3 (Gosline Aff. Ex. 10).] There is no language in Section 8.11 that suggests that the procedures are mandatory, as Gosline claims. To the contrary, Section 8.11 says that progressive discipline is generally used, but may be bypassed altogether, and that an employee may be discharged if warranted by the nature of the violation.

In short, Gosline has failed to raise a fact issue that he was anything other than an at-will employee. Thus, he cannot demonstrate that he was deprived of a protected property

interest.  Accordingly, Defendants are entitled to summary judgment on Counts I and II.[3]

### 2.    Fourteenth Amendment: Liberty Interest (Count III)

Gosline alleges that the circumstances of his termination, which included "being branded a sexual deviant and predator because of the unjustified and unsupported claims of Duff and Sisneros [such that] he was forced to leave his employment with NMFA under a cloud of humiliation and embarrassment" deprived him of a  Fourteenth Amendment liberty interest.  [Doc. 21 at 10.]  He further alleges that the stigmatizing effect "will lead to harm in Gosline's attempts to seek and obtain other comparable employment within the Santa Fe and Albuquerque communities."  [Id. at 10–11.]

A liberty interest claim exists "[w]hen a public employer takes action to terminate an employee based upon a public statement of unfounded charges of dishonesty or immorality that might seriously damage the employee's standing or associations in the community and foreclose the employee's freedom to take advantage of future employment opportunities...." Melton v. City of Okla. City, 928 F.2d 920, 927 & n.11 (10th Cir. 1991).  To be actionable, the charges must be disclosed publicly.  Bishop, 426 U.S. at 348.

Gosline's liberty interest claim fails because there is no evidence that the allegations against him were made public.  Both Duff and Sisneros have submitted affidavits in which they state that they never discussed the reasons for Gosline's termination with anyone other

---

[3]The Court's conclusion that Gosline was an at-will employee without a constitutionally-protected property interest renders moot the issues of whether Defendants had cause to terminate him, whether the draft Acceptable Use Policy was ever finalized, whether it applied to Gosline, and whether his conduct violated it.  Also moot is the question whether the pre-termination procedures were adequate, and whether Gosline was entitled to a post-termination hearing, as he claims.

than the RCI personnel involved in the investigation, NMFA employees Yanez, Dora C

DeBaca (NMFA's Personnel Director), Reynold Romero (NMFA's General Counsel),

outside counsel, and Gosline himself.  [Doc. 39 at 7 (Duff Aff. ¶ 23); doc. 40 at 6 (Sisneros

Aff. ¶21).]  Gosline has failed to respond to this argument and failed to present any evidence

to the contrary.

Accordingly, Gosline cannot demonstrate that he was deprived of a liberty interest in

violation of the Fourteenth Amendment, and Defendants are entitled to summary judgment

on Count III.

### 3.      First Amendment:  Free Speech (Count IV)

Gosline alleges he was terminated in retaliation for exercising his First Amendment

free speech rights, specifically, for participating in the EPA interview.   Free speech

retaliation claims by public employees involve balancing the interests of the employee, as

a citizen, in commenting upon matters of public concern, and the interest of the state, as

employer, in promoting the efficiency of the public services it performs through its

employees.  Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968).

Two inquiries guide interpretation of the constitutional protections accorded to public

employee speech.  Garcetti v. Ceballos, 547 U.S. 410, 418 (2006).  "The first requires

determining whether the employee spoke as a citizen on a matter of public concern."

Garcetti, 547 U.S. at 418 (citing Pickering, 391 U.S. at 568).  "If the answer is no, the

employee has no First Amendment cause of action based on his or her employer's reaction

to the speech."  Garcetti, 547 U.S. at 418 (citing Connick v. Myers, 461 U.S. 138, 147, 103

S.Ct. 1684 (1982)).  If the answer is yes, then the possibility of a First Amendment claim arises and the question becomes whether the government entity had an adequate justification for treating the employee differently from any other member of the general public.  Garcetti, 547 U.S. at 418.

The Supreme Court decision in Garcetti has profoundly altered how courts review First Amendment retaliation claims.  Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1325 (2006).  After Garcetti, the crux of the inquiry is whether the employee acted pursuant to his or her official duties.  Green v. Bd of County Comm'rs, 472 F.3d 794, 798 (10th Cir. 2007).  If a public employee engages in speech during the course of performing an official duty and the speech reasonably contributes to or facilitates the employee's performance of the official duty, the speech is made pursuant to the employee's official duties and is not protected by the First Amendment.  Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1203 (10th Cir. 2007).

A public employee's claim that he was retaliated against for exercising freedom of speech rights involves a five-part test referred to as the "Garcetti/Pickering" analysis.[4] Brammer-Hoelter, 492 F.3d at 1202.  "First, the court must determine whether the employee speaks pursuant to his official duties."  Id. (citing Garcetti, 126 S.Ct. at 1960) (internal quotation marks and brackets omitted).  "Second, if an employee does not speak pursuant to his official duties, but instead speaks as a citizen, the court determines whether the subject

---

[4]Prior to the Supreme Court's decision in Garcetti v. Ceballos, the inquiry combined the first two steps and was described as four-part test.  Brammer-Hoelter, 492 F.3d at 1202 n.4 (citing Lybrook v. Members of Farmington Mun. Schs. Bd. of Educ., 232 F.3d 1334, 1338 (10th Cir. 2000)).

of the speech is a matter of public concern." Id. at 1202–03 (citing Green, 472 F.3d at 798).
If the subject is not a matter of public concern, the speech is unprotected and the inquiry
ends. Id. at 1203. "Third, if the employee speaks as a citizen on a matter of public concern,
the court must determine whether the employee's interest in commenting on the issue
outweighs the interest of the state as an employer." Id. (citing Casey, 473 F.3d at 1327
(internal quotation marks omitted). Fourth, if the employee's interest outweighs the
employer's interest, the employee must show that his speech was a "substantial motivating
factor or a motivating factor" in the detrimental employment decision. Id. (citing Lybrook,
232 F.3d at 1338). "Finally, if the employee establishes that his speech was such a factor,
the employer may demonstrate that it would have taken the same action against the employee
even in the absence of the protected speech." Id. (citing Lybrook, 232 F.3d at 1339) (internal
quotation marks omitted).

     Gosline's First Amendment claim fails because he cannot meet the first prong of the
Garcetti/Pickering test. If "an employee engages in speech during the course of performing
an official duty and the speech reasonably contributes to or facilitates the employee's
performance of the official duty, the speech is made pursuant to the employee's official
duties." Brammer-Hoelter, 492 F.3d at 1203. Here, the only evidence presented indicates
that when Gosline spoke with the EPA agents, he was speaking pursuant to his official
duties. According to NMFA's General Counsel, Reynold Romero, a special agent from the
EPA requested to interview Gosline, and Grace Romero, both of whom worked in the
Accounting Department, Defendant Sisneros, who was the subject of the complaint, and

16

another employee.  [Doc. 38 at 2 (Romero Aff. ¶ 3).]  Romero was present during the EPA's interview with Gosline on October 31, 2007, and states that the subject of the interview concerned the use of, auditing, allocation, and methods to prevent misuse of funds.  [Doc. 38 at 3 (Romero Aff. ¶ 5).]  Gosline was the Chief Financial Officer and head of NMFA's Accounting Department.  An official interview regarding allegations that funds had been misused within his agency cannot reasonably be characterized as falling outside the scope of his employment responsibilities.  In short, there is no evidence that Gosline was acting as a private citizen or in anything other than a professional capacity when he participated in an interview at the request of the EPA.

The Court thus concludes that the speech did not enjoy First Amendment protection. Defendants are therefore entitled to summary judgment on Count IV.

### 4.        Fourth Amendment: Violation of Privacy (Count XV)

Gosline contends that Sisneros and Duff violated his constitutional right to privacy when they monitored his personal use of his workplace computer and examined his personal emails and other communications.  He claims that he had a subjective expectation of privacy in his NMFA computer sufficient to support a constitutional claim.  Though Gosline has described his claim as one for "privacy," it is more accurately characterized as a Fourth Amendment search and seizure claim.

"Searches and seizures by government employers or supervisors of the private property of their employees...are subject to the restraints of the Fourth Amendment." O'Connor v. Ortega, 480 U.S. 709, 715 (1987).  The Supreme Court has set forth a general

framework for analyzing claims that an employee has been the subject of an unreasonable search and seizure by a public employer.  O'Connor, 480 U.S. 709.  An employee only has standing to object to a search and seizure if government officials infringed "an expectation of privacy that society is prepared to consider reasonable."  O'Connor, 480 U.S. at 715 (quoting United States v. Jacobsen, 466 US. 109 (1984)).

The first question then is whether the employee has a reasonable expectation of privacy; it is a question that must be addressed on a case-by-case basis given the great variety of work environments in the public sector.  O'Connor, 480 U.S. at 718.  Once a reasonable expectation of privacy is established, the Court must then determine whether the search was reasonable.  O'Connor, 480 U.S at 725–26.  "Reasonableness" is a twofold inquiry:  first, the action must be justified at its inception, and second, the search must be reasonably related in scope to the circumstances which justified the interference in the first place.  O'Connor, 480 U.S at 726.

### a.      Reasonable expectation of privacy

Defendants argue that Gosline had no expectation of privacy in information created or stored on the computer owned and maintained by NMFA.  Gosline, on the other hand, claims he did have a "legitimate, subjective expectation of privacy in his personal use of his NMFA computer[.]  [Doc. 46 at 20.]  In this case, it is undisputed that the May 2005 Personnel Policies in effect when Gosline was most recently hired and when he was terminated contain the following two sections:

8.5    WORKPLACE PRIVACY

18

[NMFA] regards [NMFA] vehicles, desks, computers, furniture, locks, work spaces, data, programs, and other property acquired by, developed for, or located in the [NMFA] facility, to be [NMFA] property. This property is provided for employees to use while conducting [NMFA] business, and *there is no right to personal privacy with respect to use of [NMFA] property*. [NMFA] reserves the right to inspect the same if, in its sole discretion, it determines that there is a security, health, suspicion of misconduct, or other appropriate reason to do so.

[Doc. 37-3 (emphasis added).]

### 8.6   USE OF ELECTRONIC COMMUNICATIONS EQUIPMENT

[NMFA's] electronic communications equipment and resources are provided for the benefit of providing services to the public, and they are to be used only for that purpose, except as otherwise explicitly stated in written policies. Users of this equipment are responsible for its safe and appropriate usage and will be held accountable for their actions in accessing information, utilizing network and stand-alone computer services, expending limited resources and posting information in any form or in communications on a networked or stand-alone computer. To this end, employees are responsible for safeguarding the security of their access password or other codes and equipment assigned for their use

When employees use [NMFA's] computers, they are creating [NMFA] documents using [NMFA] assets. The computers and telephones and the information stored on them are [NMFA] property and as such computer data, voicemail messages, *electronic mail messages, and other data may be subject to search or review as part of a random review of [NMFA] assets or an investigation in response to a specific incident*.

Unethical, illegal or unacceptable use of electronic communications equipment may result in disciplinary action, up to and including termination.

All employees who are assigned a computer to use as part of their job will receive a copy of [NMFA's] current acceptable use policy which contains detailed information about the use of [NMFA's] electronics communications systems.

[Doc. 37-4 (emphasis added).]

Sections 8.5 and 8.6 unequivocally state that employees should not expect to enjoy

privacy when using NMFA property, including computers, and that electronic data, including

electronic mail messages may be subject to search and review.  Furthermore, in May 2007,

NMFA implemented a "log-in banner" that would display every time a user logged on to an

NMFA computer.  [Doc. 54-2 at 2 (2d. Yanez Aff. ¶ 3).]  The log-in banner states:

> THIS IS A PRIVATE COMPUTER SYSTEM
> This computer system including all related equipment, network devices [specifically including Internet access] are provided only for authorized use.  All computer systems may be monitored for all lawful purposes to assure that their use is authorized, for management of the system, to facilitate protection against unauthorized access, and to verify security procedures, survivability and operational security.  Monitoring includes active attacks by authorized personnel and their entities to test or verify the security of the system.  During monitoring, information may be examined, recorded, copied and used for authorized purposes.  All information including personal information, placed or sent over this system may be monitored.  Use of this system, authorized or unauthorized, constitutes consent to monitoring of the system. Unauthorized use may subject you to criminal prosecution.  Evidence of any such unauthorized use collected during monitoring may be used for administrative, criminal or other adverse action.  Use of this system constitutes consent to monitoring for these purposes.

[Doc. 54-2 at 5.]

Announcements of this type typically destroy any reasonable expectation of privacy

that employees claim to have in their workplace computers.  See Biby v. Bd. of Regents, of

the Univ. of Neb. at Lincoln, 419 F.3d 845, 850–51 (8th Cir. 2005); Muick v. Glenayre

Elecs., 280 F.3d 741, 743 (7th Cir. 2002) (observing that abuse of workplace computers is

so common that absence of monitoring policy by public employers "might well be thought

irresponsible"); U.S. v. Simons, 206 F.3d 392, 398 (4th Cir. 2000) (employee lacked

expectation of privacy where employer's policy clearly stated it would "audit, inspect, and/or

monitor" use of the Internet, including e-mail messages, "as deemed appropriate").

The Tenth Circuit has held that a monitoring policy and "splash screen" used by

Oklahoma State University, which is similar to the policy and "log-in banner" in this case "prevent[s] employees from reasonably expecting privacy in data downloaded from the Internet onto University computers." U.S. v. Angevine, 281 F.3d 1130, 1134 (10th Cir. 2002).  Like the NMFA policy, the "University computer-use policy reserved the right to randomly audit Internet use and to monitor specific individuals suspected of misusing University computers." Angevine, 281 F.3d at 1134.  Also like the NMFA policy, the University policy "explicitly cautions computer users that information flowing through the University network is not confidential...." Angevine, 281 F.3d at 1134.  The Tenth Circuit thus concluded that "reasonable Oklahoma State University computer uses should have been aware network administrators and others were free to view data downloaded from the Internet." Angevine, 281 F.3d at 1134.

Despite these conspicuous announcements, however, Gosline claims that he nevertheless had a reasonable expectation of privacy in his NMFA computer because "Yanez specifically stated to Gosline and other NMFA employees that we could expect to enjoy privacy related to personal computer use." [Doc. 46-2 at 5 (Gosline Aff. ¶ 23).]  The Court is not persuaded that this bare contention in Gosline's affidavit is sufficient to raise a fact issue.  Conclusory and self-serving affidavits are not sufficient to meet a party's burden on summary judgment. Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir. 1991).  "Affidavits or other evidence offered by a nonmovant must create a genuine issue for trial; viewing the evidence in the light most favorable to the nonmovant, it is not enough that the evidence be 'merely colorable' or anything short of 'significantly probative.'" Hall, 935 F.3d at 1111

21

(quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249–50 (1986)).  "This is because when 'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'"  <u>Hall</u>, 935 F.3d at 1111 (quoting <u>Matsushita Elec. Indust. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).

Gosline's statement that he was told he could "expect to enjoy privacy" is a legal conclusion couched as a hearsay statement and is utterly lacking in factual specifics.  The affidavit does not provide any information regarding the date, nature, or context of the conversation in which he was told he could "expect to enjoy privacy related to personal computer use."  Also absent are facts that would establish that Yanez was acting as NMFA's agent when he made this statement or that he was authorized to confer privacy rights in contravention of NMFA's clearly announced policy.  Defendants deny that Yanez has such authority.  [Doc. 54-3 at 2 (2d. Sisneros Aff. ¶ 4).]

The Court concludes that the record taken as a whole could not lead a rational trier of fact to find that Gosline had a reasonable expectation of privacy given the undisputed evidence that NMFA had a policy reserving the right to monitor his computer usage.  Gosline's burden is to "present sufficient evidence in specific, factual form for a jury to return a verdict" in his favor.  <u>Thompson v. Johnson County Cmty. Coll.</u> 930 F.Supp. 501, (D. Kan. 1996) (quoting <u>Thomas v. Int'l Bus. Machs.</u>, 48 F.3d 478, 484 (10th Cir. 1995)).  He has failed to meet that burden.

### b.    Reasonableness of the search

Even if Gosline's affidavit were sufficient to raise a fact issue regarding expectation

of privacy, his Fourth Amendment claim would still fail because he has not demonstrated that the search was unreasonable. Contrary to Gosline's contention, he cannot establish a constitutional violation merely by demonstrating an expectation of privacy. That is only the beginning of the analysis. He also must show that the search was unreasonable—an issue he has failed to address at all.

Generally, work-related searches have been held to satisfy the Fourth Amendment's reasonableness requirements. O'Connor, 480 U.S. at 720–21. Although Gosline denies any inappropriate use of emails, he does not dispute that the search was work-related, nor does he dispute Defendants' justification for the search. Defendants' evidence shows that the search was justified at its inception by a suspicion that inappropriate computer use by Gosline and others in the Accounting Department had led to the introduction of a destructive virus into NMFA's computer system. A virus had destroyed Gosline's computer beyond repair; it was the second virus incident within a few months, and was accompanied by reports of the suspicious movement of computer files in Gosline's department.

The record also reflects that the search was reasonable in scope. A workplace search is reasonable if it is "reasonably related in scope to the circumstances which justified the interference in the first place." O'Connor, 480 U.S. at 726 (citation and quotation marks omitted). The search here involved the use of monitoring software that captured on-screen images of Gosline's computer usage.[5] Gosline has offered no reason to believe that the scope

---

[5]The images of Gosline's screen captured during the period August through October 2007 allegedly showed him visiting the Craig's List website, accessing his personal email account, composing and receiving sexually explicit emails indicating that he was setting up appointments to engage in sexual

of the search was excessive or that it was unrelated to the objective of determining whether he was using his computer in an unauthorized manner.

Furthermore, assuming that Gosline could establish a Fourth Amendment violation, Defendants still would be entitled to qualified immunity.  The law regarding workplace searches by public employers under facts such as are presented here, is not clearly established.  O'Connor v. Ortega, while providing guidelines for evaluating workplace searches, did not involve a computer search, and is notable as much for the questions it did not answer as for the guidance it provides.  There is no Tenth Circuit case directly on point, and as recently as this year, courts have struggled to define expectations of privacy in the workplace.  See U.S. v. SDI Future Health, Inc., 553 F.3d 1246, 1253–56 (9th Cir. 2009) (surveying cases and noting "little case law directly on point").  Given NMFA's explicit policy reserving the right to randomly monitor computer usage, Defendants Sisneros and Duff reasonably could have believed that their actions did violate any clearly-established law.[6]

The Court concludes that Gosline has not shown that he had a reasonable expectation of privacy in his NMFA computer.  The Court further concludes that even if he established an expectation of privacy, he has failed to demonstrate that the scope of the search was unreasonable.  Accordingly, Defendants are entitled to summary judgment on Gosline's

---

acts, and opening emails containing nude photographs of the sender.  [Doc. 36-4 at 6–7; doc. 54-2 at 7–8.]

[6]Contrary to Gosline's contention, the qualified immunity inquiry is objective, not subjective. Keylon, 535 F.3d at 1218.  Thus, it is irrelevant that neither Sisneros or Duff stated in their affidavits that they had did not believe that Gosline had legitimate expectation of privacy in his computer.

Fourth Amendment claim (Count XV).

### 5.   42 U.S.C. § 1983 Conspiracy (Count XI)

Gosline alleges that Defendants Sisneros and Duff conspired with Defendant RCI to deprive him of his civil and constitutional rights.  [Doc. 21 at 18.]  To succeed on a section 1983 conspiracy claim, the plaintiff "must prove both the existence of a conspiracy and the deprivation of a constitutional right."  Thompson v. City of Lawrence, Kan., 58 F.13 1511, 1517 (10th Cir. 1995).  Because Gosline cannot show that he was deprived of any constitutional rights, summary judgment also must be granted on this claim.

### 6.   Employee Polygraph Protection Act ("EPPA")

Gosline's Amended Complaint includes the allegation that he was required to submit to a polygraph test administered at NMFA's offices and that "NMFA failed to satisfy the requirements of the [EPPA]."  [Doc. 21 at 4.]  However, the Amended Complaint does not include a separate count or cause of action for violation of the EPPA.

To the extent Gosline seeks to impose liability under the EPPA, Defendants move for summary judgment on that claim as well.  They argue that the EPPA has no application to government employers such as NMFA.  Indeed, the EPPA states that its provisions "shall not apply with respect to the United States Government, any State or local government, or any political subdivision of a State or local government."  29 U.S.C.  § 2006(a).  Defendants point to the definition of "political subdivision of a State or local government" which states that it is an entity which is either: "(1) Created directly by a state or local government, or (2) Administered by individuals who are responsible to public officials (i.e., appointed by an

elected public official(s) and/or subject to removal procedures for public officials, or to the general electorate."  29 C.F.R. § 801.10(c) (2009).

It is undisputed that NMFA was created by the State Legislature.  It thus would appear that it is expressly exempt from the provisions of the EPPA.  Gosline has failed to offer any argument in response.  Accordingly, the Court concludes that to the extent he attempted to assert a violation of the EPPA, he has abandoned that claim on summary judgment.

### B.    State law claims

Gosline's Amended Complaint asserts the following state law claims:  breach of implied covenant of employment (Count V); defamation (Count VI); prima facie tort (Count VII); negligent misrepresentation (Count VIII); wrongful termination/retaliatory (Count IX); negligence (Count X); tortious interference with contractual relations (Count XII); civil conspiracy (Count XIII); and breach of the implied covenant of good faith and fair dealing (Count XIV).  Counts VI, VII, and VIII were dismissed by stipulation.  [Doc. 34.]  Sisneros and Duff move for summary judgment on the remaining state law claims.

Sisneros and Duff argue that they are immune from liability for state law claims pursuant to the New Mexico Finance Authority Act and the New Mexico Tort Claims Act. Gosline has failed to address the state law claims in his response brief.  The New Mexico Finance Authority Act, NMSA 1978, § 6-21-1 through § 6-21-31 (1992), which creates the NMFA, includes a provision that limits the liability of persons acting in its behalf:

> Neither any member of the authority nor any person acting in its behalf, while acting within the scope of his authority, shall be subject to any personal liability for any action taken or omitted within that scope of authority.

NMSA 1978, § 6-21-25.  Gosline does not contend that Sisneros and Duff were acting without authority.  And it appears undisputed that, as Chief Executive Officer and Chief Operating Officer, they were acting on behalf of the NMFA and within the scope of their authority when they took the employment actions Gosline complains of here.

The Court concludes that Sisneros and Duff are immune from liability pursuant to the New Mexico Finance Act.[7]  Accordingly, they are entitled to summary judgment on all state law claims that have not already been dismissed pursuant to stipulation.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that Gosline has failed establish any constitutional violations, that Defendants Sisneros and Duff are entitled to qualified immunity against Gosline's federal constitutional claims, and that they are immune from liability for state Gosline's state law claims.

**IT IS, THEREFORE, ORDERED** that *Defendants William C. Sisneros' and John T. Duff's Motion for Summary Judgment* [Doc. 41], filed July 1, 2008, is **GRANTED** as to all claims against these two Defendants.

**SO ORDERED** this 30th day of March 2009**,** in Albuquerque New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge

---

[7]Because the Court finds Defendants are immune under the New Mexico Finance Authority Act, it need not consider whether Defendants have sovereign immunity, or whether sovereign immunity has been waived by the New Mexico Tort Claims Act.